**No. 26-6092**

In the

# United States Court of Appeals
## For the Ninth Circuit

VALVE CORPORATION,

*Petitioner-Appellant,*

v.

USERS OF VALVE'S VIDEO GAME PLATFORM, STEAM,

*Respondents-Appellees.*

On Appeal from the United States District Court for the Western District of Washington, No. 2:24-cv-01717-JNW
Honorable Jamal N. Whitehead, U.S. District Judge

**BRIEF OF AMICUS CURIAE RETAIL LITIGATION CENTER, INC. IN SUPPORT OF PETITIONER-APPELLANT**

Monica Welt
Joshua Moore
RETAIL LITIGATION CENTER, INC.
99 M Street, S.E., Suite 700
Washington, DC 20003
T: (202) 869-0200
monica.welt@rila.org
joshua.moore@rila.org

Amy Morrissey Turk
MCGUIREWOODS LLP
101 West Main Street,
Suite 9000
Norfolk, VA 23510
T: (757) 640-3711
F: (757) 640-3942
aturk@mcguirewoods.com

*(additional counsel listed on inside cover)*

Paul M. Chappell
McGuireWoods LLP
2601 Olive Street, Suite 2100
Dallas, TX 75201
T: (214) 932-6472
F: (214) 273-7473
pchappell@mcguirewoods.com

Grace Greene Simmons
McGuireWoods LLP
1075 Peachtree St. NE
35th Floor
Atlanta, GA 30309
T: (404) 443-5500
F: (404) 443-5599
gsimmons@mcguirewoods.com

*Counsel for Amicus Curiae Retail Litigation Center, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1 and Circuit Rule 26.1-1, undersigned counsel certifies that the Retail Litigation Center, Inc. has no parent corporation and no publicly held corporation owns 10% or more of amicus's stock.

*/s/ Amy Morrissey Turk*
Amy Morrissey Turk

# TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF AMICUS CURIAE ........................................1

INTRODUCTION ........................................................................................3

ARGUMENT...............................................................................................5

I. The mass arbitration model places ethical duties under structural strain and creates opportunities for abuse. ...........................5

A. Every mass arbitration claimant is an individual client owed the full set of a lawyer's ethical duties. ..............................6

B. The settlement leverage comes from fees, not merits, so the incentive is volume over diligence.........................................8

C. Litigation funding has become increasingly prevalent in mass arbitrations and presents additional ethical concerns. ..........................................................................................9

II. Abuses evident in the *Valve* record raise serious ethical questions. ...............................................................................................11

A. The campaign against Valve started as a profit-making scheme, not a claim evaluation. ..................................................11

B. Claimants were apparently not told of the litigation funding behind the campaign. ....................................................13

C. Counsel's solicitations caused confusion among claimants. ....................................................................................15

D. The filings raise questions about whether counsel adequately vetted claimants' claims...........................................17

E. The record raises concerns about counsel's communication with claimants. .................................................17

III. Other abuses in mass arbitrations in the public record show that the *Valve* case is not an aberration...............................................21

A. Misleading solicitations and intake create "clients" who do not know what they signed up for. ....................................... 22

B. The mass arbitration model all but precludes counsel from ethically vetting their clients' purported claims. ............. 25

C. Claimants' counsel in a mass arbitration likely cannot meet their ethical duties of communication and informed consent ........................................................................................ 27

D. Litigation funding creates pressure that may interfere with claimants' counsel's ethical obligations to mass arbitration clients. ......................................................................... 29

IV. The ethical problems attendant to mass arbitrations bear directly on Valve's preliminary injunction motion. ........................... 31

CONCLUSION ............................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Engle Cases*,
283 F. Supp. 3d 1174 (M.D. Fla. 2017) ....................7

*In re Pork Antitrust Litig.*,
2024 WL 511890 (D. Minn. Feb. 9, 2024) ....................29, 30

*In re Valsartan N-Nitrosodimethylamine (NDMA), Losartan, & Irbesartan Prods. Liab. Litig.*,
2020 WL 955059 (D.N.J. Feb. 27, 2020) ....................7

*Jones v. Starz Ent., LLC*,
129 F.4th 1176 (9th Cir. 2025)....................4, 6, 8, 10, 21

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013)....................1

*L'Occitane, Inc. v. Zimmerman Reed LLP*,
2024 WL 2227182 (C.D. Cal. Apr. 12, 2024) ....................26

*Montes v. SPARC Grp., LLC*,
586 P.3d 999 (Wash. 2026) (en banc)....................1

*Nelson v. McGoldrick*,
896 P.2d 1258 (Wash. 1995) (en banc)....................33

*S. Leasing Partners, Ltd. v. McMullan*,
801 F.2d 783 (5th Cir. 1986) ....................25

*Thomas v. Cap. Sec. Servs., Inc.*,
836 F.2d 866 (5th Cir. 1988) (en banc) ....................25

*South Dakota v. Wayfair, Inc.*,
585 U.S. 162 (2018)....................1

*Valve Corp. v. Abbruzzese*,
2026 WL 1481630 (W.D. Wash. May 27, 2026) .................................. 5, 31, 33

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................... 32

**Rules**

Fed. R. App. P. 29(a)(2) ........................................................................ 1

D.N.J. L. Civ. R. 7.1.1 ............................................................................. 30

ABA Model R. Pro. Conduct 1.0 ........................................................ 18, 27

ABA Model R. Pro. Conduct 1.0 cmt. 7 ............................................. 18, 27

ABA Model R. Pro. Conduct 1.2 ................................................ 18, 19, 27

ABA Model R. Pro. Conduct 1.2 cmt. 1 ............................................. 19, 27

ABA Model R. Pro. Conduct 1.3 ................................................ 13, 17, 25

ABA Model R. Pro. Conduct 1.3 cmt. 2 ............................................. 13, 17

ABA Model R. Pro. Conduct 1.4 ................................................ 17, 18, 27

ABA Model R. Pro. Conduct 1.7 ........................................................ 15, 29

ABA Model R. Pro. Conduct 1.7 cmt. 13 ................................................. 15

ABA Model R. Pro. Conduct 1.8 ..................................... 7, 13, 14, 15, 29

ABA Model R. Pro. Conduct 1.8 cmt. 14 ....................................... 7, 15, 29

ABA Model R. Pro. Conduct 1.8 cmt. 15 ....................................... 7, 15, 29

ABA Model R. Pro. Conduct 1.8 cmt. 16 ................................................... 7

ABA Model R. Pro. Conduct 1.16 ............................................................ 19

ABA Model R. Pro. Conduct 3.1 ................................................ 12, 17, 25

ABA Model R. Pro. Conduct 3.1 cmt. 2 ............................................. 12, 17

ABA Model R. Pro. Conduct 3.3 ........................................................................19

ABA Model R. Pro. Conduct 5.4 ...................................................................14, 29

ABA Model R. Pro. Conduct 7.1 ...................................................................16, 22

ABA Model R. Pro. Conduct 7.1 cmt. 1.........................................................16, 22

ABA Model R. Pro. Conduct 7.1 cmt. 3.........................................................16, 22

ABA Model R. Pro. Conduct 7.3 cmt. 6..............................................................16

Wash. R. Pro. Conduct 1.8 cmt. 13......................................................................6

**Other Authorities**

Aff. of William Bucher, *Zaiger LLC v. Bucher Law PLLC*,
No. 154124/2023 (N.Y. Sup. Ct. May 9, 2023),
NYSCEF Doc. No. 29 ..........................................................................................12

Br. of Amicus Curiae Retail Litig. Ctr., Inc., *Wallrich v. Samsung Elecs. Am., Inc.*, No. 23-2842 (7th Cir. Nov. 21, 2023),
ECF No. 43..............................................................................................9, 26, 28

Compl., *Epson Am., Inc. v. Adams*,
No. 30-2023-01313431 (Cal. Super. Ct. Orange Cnty. Mar. 13,
2023) ......................................................................................................................27

Compl., *SCPS, LLC v. Kind Law*, No. 1:24-cv-2768
(D.D.C. Sept. 27, 2024), ECF No. 1 ..................................................................27

Compl., *Sega of Am., Inc. v. Consovoy McCarthy PLLC*,
No. 1:25-cv-257 (E.D. Va. Feb. 10, 2025), ECF No. 1 .............................26, 28

Decl. of Richard Zitrin, *Abernathy v. DoorDash, Inc.*,
No. 3:19-cv-7545 (N.D. Cal. Nov. 22, 2019), ECF No. 35-1...........................6

First Am. Compl., *Tubi, Inc. v. Keller Postman LLC*,
No. 1:24-cv-1616 (D.D.C. Nov. 25, 2024), ECF No. 22-1 .......................23, 24

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283 (2022) ..........6, 8, 9, 30

Labaton Sucharow, *Samsung Galaxy User In Illinois?*,
https://perma.cc/E6TM-AQHJ (last visited Nov. 3, 2026) ......................23

Letter from Christopher M. Carr, Att'y Gen. of Ga., to Kimberly
Taylor, CEO, JAMS, et al. (Dec. 1, 2025) ..............................................22, 24

Letter from Jaime Huff, Vice President & Counsel, Civil Justice
Ass'n of Cal., to Enrique Zuniga, Public Trust Liaison, State
Bar of Cal. (July 6, 2023), https://perma.cc/DHW9-EZ5Q ....22, 24, 26, 27

Mark A. Behrens, *Third-Party Litigation Funding: A Call for
Disclosure and Other Reforms to Address the Stealthy Financial
Product That Is Transforming the Civil Justice System*,
34 Cornell J.L. & Pub. Pol'y 1 (2024) ....................................................10, 29

Mem. ISO Mot. to Disqualify, *Marriott Int'l, Inc. v. Sperling
Kenny Nachwalter, LLC*,
No. 1:26-cv-900 (D. Md. June 4, 2026), ECF No. 37-1............................26, 27

Order, *In re Valve Antitrust Litig.*,
No. 21-cv-563 (W.D. Wash. May 2, 2025), ECF No. 441 ............................20

Pet. to Compel Arb., Exs. N-O, *Wallrich v. Samsung Elecs. Am.,
Inc.*, No. 1:22-cv-5506 (N.D. Ill. Oct. 7, 2022),
ECF Nos. 1-15, 1-16 ......................................................................................28

Pl.'s Notice of (1) New Evidence Regarding Pending Motions
and (2) Intent to Amend the Compl., *Marriott Int'l, Inc. v.
Sperling Kenny Nachwalter, LLC*,
No. 1:26-cv-900 (D. Md. June 4, 2026), ECF No. 48 .....................................24

Richard Zitrin, *Regulating the Behavior of Lawyers in Mass
Individual Representations: A Call for Reform*,
3 St. Mary's J. Legal Malpractice & Ethics 86 (2013) ....................................7

Rule 28(j) Letter, *Mosley v. Wells Fargo & Co.*,
No. 23-55478 (9th Cir. Nov. 15, 2023), ECF No. 25......................................26

U.S. Chamber of Com. Inst. for Legal Reform, *Mass Arbitration
Shakedown: Coercing Unjustified Settlements* (Feb. 28, 2023) ..........................9

U.S. Gov't Accountability Off., GAO-25-107214 (2024)............................29, 30

Verified Compl., *Metropolis Techs., Inc. v. Almada*,
C.A. No. 2026-1401 (Del. Ch. Oct. 22, 2026) ................................................23

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

The Retail Litigation Center, Inc. (the "RLC") is a 501(c)(6) nonprofit trade association that represents national and regional retailers across a breadth of retail verticals. The RLC's members employ millions of people throughout the U.S., provide goods and services to tens of millions more, and account for over a trillion dollars in annual sales. The RLC offers retail-industry perspectives to courts on important legal issues. Since its founding in 2010, the RLC has filed more than 250 amicus briefs. *See, e.g.*, *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 184 (2018) (citing the RLC's brief); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 542 (2013) (same); *Montes v. SPARC Grp., LLC*, 586 P.3d 999, 1004 & n.4 (Wash. 2026) (en banc) (same).

Many of the RLC's members rely on agreements for individual arbitration and have structured millions of contractual relationships around

[1] The RLC has simultaneously submitted a motion for leave to file this amicus brief. Fed. R. App. P. 29(a)(2). Counsel for Petitioner-Appellant consented to the filing of this brief. Counsel for the RLC reached out to counsel for Respondents-Appellees on October 29 and November 2, but as of filing, Respondents-Appellees have not provided a position. No party's counsel authored this brief in whole or in part, and no such counsel nor any party here contributed money intended to fund the preparation of this brief or its submission. No person other than amicus, its members, and/or its counsel contributed money intended to fund the preparation or submission of this brief.

arbitration's speed, simplicity, low cost, and accessibility. Done right, arbitration is efficient and beneficial to companies and consumers. But RLC members increasingly confront mass-arbitration campaigns that can impose substantial up-front fees before the validity or authorization of individual claims can be tested.

Unfortunately, the mass-arbitration practices alleged here, including recruiting and filing claims at scale without adequate vetting, communicating inadequately with individual clients, and financing the campaign through an undisclosed third party, are not concerns unique to Valve Corporation. Similar practices have arisen in mass arbitrations involving other national businesses, including retailers, and impose substantial costs even when the underlying claims are unauthorized, duplicative, or otherwise defective. Yet, due to the confidential nature of arbitration, most of these abuses evade any type of court review. The Court's resolution of the issues presented in this appeal therefore may affect retailers' ability to protect the integrity of their arbitration programs and to obtain meaningful review of alleged misconduct in the initiation of mass claims.

## INTRODUCTION

For nearly three years, Valve Corporation ("Valve") has defended a mass arbitration designed from the outset not to resolve claims but to monetize them. Before a single demand was filed, claimants' counsel pitched a litigation funder on a "Mass Arbitration Strategy and Investment Opportunity" that would "weaponize[]" Valve's arbitration agreement, because "[a]ggregating claims makes [the] entrance fee to just defend [arbitrations] prohibitively expensive." D.Ct. Dkt. 79 at 1. The pitch priced each claimant as a $50 "acquisition" and promised the funder a "1874% ROI." *Id*. Counsel then threatened claims on behalf of 44,903 individuals and ultimately pursued arbitrations for 4,991. D.Ct. Dkt. 81 ¶¶ 2, 4-6.

What followed is a catalogue of ethical problems and consumer protection concerns. Counsel filed demands for the deceased, the bankrupt, minors, and people already represented by other firms. D.Ct. Dkt. 78 ¶¶ 18, 107 n.28, 221. In one arbitration, counsel withdrew claims on the eve of a merits hearing *after* the arbitrator decided to issue sanctions; the claimant in that case was a minor. *Id.* ¶ 107 & nn.27-28. Many of the thousands of claimants contacted Valve to say they were confused, did not know an arbitration had been filed in their name, or wanted out—and some were told

by their "counsel" that withdrawing their arbitration demand would cost them. D.Ct. Dkt. 40 ¶¶ 12, 16, 18-19, 29.

None of this is unique to Valve. Retailers and consumers across the country are being confronted with these same unethical tactics on a regular basis. Arbitration is supposed to resolve individual disputes on the merits, efficiently and cost-effectively. Mass arbitration, however, inverts that model. Why? Because the business pays most of the non-refundable arbitral fees, each demand generates leverage regardless of its merits. As this Court observed, such a campaign "appears to be geared more toward racking up procedural costs to the point of forcing [the business] to capitulate to a settlement than proving the allegations . . . to seek appropriate redress on the merits." *Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1183 (9th Cir. 2025). Businesses including Samsung, Tubi, Sega, Marriott, and L'Occitane have all confronted the same pattern Valve faces.

These problems matter to the decision before this Court. After removing its arbitration agreement, Valve moved for a preliminary injunction to halt the pending arbitrations so the claims could be heard in court. The district court ignored the ethical issues in the arbitration, instead treating the arbitrations as the product of "Valve's own design" and leaving

counsel's conduct to "the arbitrators and the bar, not . . . this Court sitting in equity." *Valve Corp. v. Abbruzzese*, 2026 WL 1481630, at *11 (W.D. Wash. May 27, 2026). But the ethical defects documented here go to the core of equity and fairness and bear directly on the various preliminary injunction factors.

Amicus does not contend that one firm can never ethically represent many similar claimants. But lawyers' obligations are the same whether they represent one client or tens of thousands, and a business that agrees to arbitrate individual disputes with its customers does not agree to underwrite an "Investment Opportunity" built on unvetted claimants and undisclosed investors. The Court should reverse the judgment below.

## ARGUMENT

### I. The mass arbitration model places ethical duties under structural strain and creates opportunities for abuse.

To understand how the abuses of mass arbitration affect Valve's case, one must understand the structure of mass arbitration. This Section highlights three issues: (1) the challenge of providing individualized representation at scale, (2) a fee structure that rewards volume over diligence, and (3) third-party funding that introduces additional financial interests into the attorney-client relationship.

### A. Every mass arbitration claimant is an individual client owed the full set of a lawyer's ethical duties.

First, mass arbitration makes it difficult for clients to receive full and adequate representation. Unlike a class action, a mass arbitration has no absent class members. It has individual clients, each with an individual claim. A claimant in a mass arbitration "brings the claim in her individual capacity," unlike a class representative who "brings claims on behalf of others." *Jones*, 129 F.4th at 1182. "Each plaintiff's claim is distinct, and each plaintiff is individually represented, not 'merely' a class member." Decl. of Richard Zitrin ¶ 4, *Abernathy v. DoorDash, Inc.*, No. 3:19-cv-7545 (N.D. Cal. Nov. 22, 2019), ECF No. 35-1; *see also* J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1350 (2022) (mass-arbitration claims "proceed individually rather than being merged into something like a single class action or MDL consolidation").

This distinction has important ethical implications. Lawyers representing a class "may not have a full client-lawyer relationship with each member of the class." Wash. R. Pro. Conduct 1.8 cmt. 13; *accord* ABA Model

R. Pro. Conduct 1.8 cmt. 16.[2] No comparable allowance is made for mass arbitration, which consists entirely of separate representations. Accordingly, "the same ethical rules that apply to lawyers who represent two clients will apply equally to lawyers representing hundreds." Richard Zitrin, *Regulating the Behavior of Lawyers in Mass Individual Representations: A Call for Reform*, 3 St. Mary's J. Legal Malpractice & Ethics 86, 88-89 (2013).

Those ethical obligations owed to each individual claimant are important and serious. A lawyer must keep each client reasonably informed, obtain each client's informed consent to material decisions, abide by each client's settlement decisions, and preserve independent professional judgment when a third party pays for the representation. These obligations do not scale down as the client list scales up. "No matter how many different clients a lawyer represents, the lawyer owes a duty of zealous representation to each individual." *In re Valsartan N-Nitrosodimethylamine (NDMA), Losartan, & Irbesartan Prods. Liab. Litig.*, 2020 WL 955059, at *4 (D.N.J. Feb. 27, 2020); *accord In re Engle Cases*, 283 F. Supp. 3d 1174, 1221 (M.D. Fla. 2017)

[2] This brief cites the ABA's Model Rules of Professional Conduct, which are national in scope and provide a model for many states' codes of professional conduct. Washington, where this case arose, has adopted the ABA rules discussed in this brief.

(rejecting "the notion that the volume of claims somehow lessens an attorney's obligations"). The scale and economics of mass arbitration raise serious questions about counsel's ability to fulfill those obligations to each client.

**B. The settlement leverage comes from fees, not merits, so the incentive is volume over diligence.**

Second, the source of settlement leverage in a mass arbitration prioritizes quantity rather than quality. In arbitration, companies agree to cover the majority of fees paid to the arbitral provider to initiate and run the arbitration. If a single firm initiates 10,000 claims, the company is on the hook for 10,000 initiation fees. Those fees are owed regardless of the merits. This "impose[s] settlement pressure for more dubious claims—that is to say, it could impose illegitimate, *in terrorem* settlement pressure." Glover, *supra*, at 1349-50; *see Jones*, 129 F.4th at 1183. Mass arbitration works by "leveraging [those] arbitration fees and fee-shifting provisions" and "arbitrating individual claims—or credibly threatening to do so—to impose asymmetric costs on the defendants." Glover, *supra*, at 1340. Distinct from other litigation, the pressure comes not from the strength of any individual claim, but from the threshold fees owed when demands are filed.

Unlike a class action, this pressure has no inherent check. In a class action, a judge decides who is in the class, whether certification is warranted, and whether any settlement is fair. But for mass arbitration, at the critical early stage, the only gatekeeper is claimants' counsel, and the model rewards that gatekeeper for letting more people through. Every added name raises the respondent's fee exposure and also counsel's leverage—whether that person has a claim, knows a claim was filed, or wants to pursue one. The incentive is to amass claimants, not to vet each claim and zealously represent each client. *See* Br. of Amicus Curiae Retail Litig. Ctr., Inc. at 7-8, *Wallrich v. Samsung Elecs. Am., Inc.*, No. 23-2842 (7th Cir. Nov. 21, 2023), ECF No. 43 (hereinafter "RLC *Wallrich* Br."); Glover, *supra*, at 1340, 1348-49. The results are predictable. Defense practitioners report that groundless claims "often exceed[] 30 percent of claims—and on a number of occasions ha[ve] exceeded 90 percent." U.S. Chamber of Com. Inst. for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* 37 (Feb. 28, 2023).

### C. Litigation funding has become increasingly prevalent in mass arbitrations and presents additional ethical concerns.

Third, money from outside the attorney-client relationship increasingly finances these campaigns. Building the "mass" in "mass

arbitration" is expensive: it requires advertising budgets, intake platforms, and the capital to front filing fees. Third-party litigation funding is the natural source of that capital. Litigation funders "front money to law firms in exchange for a portion of any recovery the firm may obtain in a settlement or court award on a client's behalf." Mark A. Behrens, *Third-Party Litigation Funding: A Call for Disclosure and Other Reforms to Address the Stealthy Financial Product That Is Transforming the Civil Justice System*, 34 Cornell J.L. & Pub. Pol'y 1, 2 (2024).

Litigation funding adds a third party with its own financial objectives to every individual representation it finances. That party owes no duty to the claimants. Instead, funders are in the business of generating returns for their investors. And an investor whose return depends on fee pressure rather than adjudication has every reason to prefer forcing a business "to capitulate to a settlement" over "proving the allegations." *Jones*, 129 F.4th at 1183.

Each of these structural features, standing alone, strains claimants' counsel's ethical duties. Together, they create a system in which those duties are at serious risk of not being satisfied.

## II. Abuses evident in the *Valve* record raise serious ethical questions.

The campaign against Valve exhibits each structural problem described above. It was conceived as an investment opportunity, financed by a funder claimants apparently were not told about, built through confusing solicitations, filed without adequate vetting of individual claimants, and maintained without meaningful client communication. Each of these issues implicate specific rules of professional conduct and demonstrate the strains mass arbitration places on counsel's ethical obligations.

### A. The campaign against Valve started as a profit-making scheme, not a claim evaluation.

The campaign against Valve began as a profit-making scheme. Before founding Bucher Law PLLC ("Bucher Law"), its principal ("Bucher") was hired by another firm "to lead [the] development and pursuit of mass arbitration strategies." D.Ct. Dkt. 78 ¶ 70. At that time, Bucher wrote a pitch to a prospective litigation funder titled "Mass Arbitration Strategy and Investment Opportunity." D.Ct. Dkt. 81 ¶ 73 & Ex. 1; D.Ct. Dkt. 78 ¶ 71. The plan was to "weaponize[]" the arbitration agreement between Valve and Steam users, because "[a]ggregating claims makes [the] entrance fee to just

defend [arbitrations] prohibitively expensive." D.Ct. Dkt. 1 ¶¶ 2, 64; D.Ct. Dkt. 79 at 1.

The plan treated each potential client as an "acquisition" cost. It projected a "spend of $3.75 million to recruit 75,000 clients at $50 an acquisition," and promised the funder a "1874% ROI on $6.5 million investment." D.Ct. Dkt. 78 ¶¶ 3, 11; D.Ct. Dkt. 79 at 1-2. It proposed offering a settlement just below the non-refundable fees needed to start the arbitrations to induce a quick payout. *See* Aff. of William Bucher ¶ 14 & Ex. A, at slide 3, *Zaiger LLC v. Bucher Law PLLC*, No. 154124/2023 (N.Y. Sup. Ct. May 9, 2023), NYSCEF Doc. No. 29. The plan did not analyze the substantive merits of the claims or any benefit to the consumers being recruited.

This approach is difficult to square with the ethics rules. "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous." ABA Model R. Pro. Conduct 3.1. Lawyers are required to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions." *Id.* at cmt. 2. Further, each client's matter must receive "reasonable diligence," and "[a] lawyer's work load must be controlled so

that each matter can be handled competently." *Id.* at R. 1.3 & cmt. 2. Lastly, "a lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of . . . the clients, . . . unless each client gives informed consent, in a writing signed by the client." *Id.* at R. 1.8(g).

Thus, instead of waiting for claimants to engage them, investigating the merits of their claim, and then proceeding with the action, counsel for claimants jumped in with an investment-first, merits-later strategy which pushed for an aggregate settlement early to negate factual vetting time.

**B. Claimants were apparently not told of the litigation funding behind the campaign.**

After starting Bucher Law, Bucher was successful in securing litigation funding to initiate the mass arbitration against Valve. On April 6, 2023, Bench Walk, the litigation funder supporting the mass arbitration, filed a UCC financing statement naming Bucher Law as debtor, referencing a litigation funding agreement dated April 5, 2023. D.Ct. Dkt. 78 ¶ 15 & n.6. The collateral included proceeds from "any and all claims asserted or to be asserted by the Debtor on behalf of the Clients against Valve Corporation." *Id.* Despite this, Bucher Law's retainer with claimants allegedly "nowhere mentions Bench Walk or litigation funding, and several claimants in

arbitration proceedings have testified under oath that they were not aware of the funding." *Id.* ¶ 15.

This litigation funding implicates several ethical rules. First, "a lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client gives informed consent; (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 1.6." ABA Model R. Pro. Conduct 1.8(f). "Because third-party payers frequently have interests that differ from those of the client, . . . lawyers are prohibited from accepting or continuing such representations unless the lawyer determines that there will be no interference with the lawyer's independent professional judgment and there is informed consent from the client." *Id.* at cmt. 14.

Second, "[a] lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment." *Id.* at R. 5.4(c). And where the lawyer's "own interest in the fee arrangement" or "responsibilities to the third-party payer" create a significant risk of material limitation, Rule 1.7

requires each affected client's informed consent, confirmed in writing. *Id.* at R. 1.8 cmt. 15; *see also id.* at R. 1.7 cmt. 13.

Each safeguard depends on disclosure. Clients cannot consent to an arrangement they do not know exists. Defendants in this litigation, Bucher's purported clients, apparently could not have given the informed consent that the ethical rules demand.

**C. Counsel's solicitations caused confusion among claimants**.

The recruitment campaign against Valve featured a marketing video telling potential claimants it was "good news" that Valve had an arbitration agreement, because "on average, consumers in arbitration recover hundreds of times more than in a class action." D.Ct. Dkt. 78 ¶¶ 16, 101. The firm that originally employed Bucher alleged that, after his departure, Bucher used his prior firm's client database to send its clients emails with the subject line "Your Case Against Valve - Action Required," claiming he had "won or settled over 70,000 consumer arbitrations," which the firm alleged was misleading and in violation of New York's ethics rules. D.Ct. Dkt. 81-8 ¶¶ 3, 5-6, 11-13, 71-72.

When Valve served the individual Defendants in this case, many contacted Valve directly. One wrote that he had seen solicitations at age

"14/15 and signed up because I didn't really know what was going on and thought 'free money.'" D.Ct. Dkt. 40 ¶ 18. Another wrote: "I thought this was a class action lawsuit. . . . I have no intention of pursuing money or any legal action." *Id.* ¶ 29. A third said she "was misinformed and it was not in my interest to file any kind of lawsuit against Valve." *Id.* ¶ 20. Claimants have also testified in final merits hearings that they were "confused as to the fact that they are participants in an arbitration." D.Ct. Dkt. 78 ¶ 46; D.Ct. Dkt. 81 ¶ 40. Valve twice requested permission to communicate with the customers that reached out, D.Ct. Dkt. 12, 39, but the district court declined, D.Ct. Dkt. 14, 76. This left the customers with no answers, potentially damaging Valve's reputation and goodwill with its consumer base.

These facts further implicate ethical rules. "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services." ABA Model R. Pro. Conduct 7.1. That includes communications to potential clients that omit necessary facts or create unjustified expectations. *Id.* at cmts. 1, 3; *see id.* at R. 7.3 cmt. 6. And clients must be kept informed so they can make decisions regarding their case; a client cannot make decisions if they do not know what they were agreeing to in the first instance. *Id.* at

R. 1.4(a)(1)-(3). Bucher apparently both overpromised results and made it impossible for the claimants to meaningfully direct their representation.

### D. The filings raise questions about whether counsel adequately vetted claimants' claims.

Bucher Law filed arbitrations on behalf of "at least seven individuals who are deceased; at least 218 individuals who are represented by other law firms pursuing the same claims; and at least 19 individuals who were at the time of this action's filing in active bankruptcy proceedings." D.Ct. Dkt. 78 ¶ 18. In this case, Bucher Law claimed to represent all Defendants, although three of them "appear[ed] to have died before Valve commenced the action." D.Ct. Dkt. 81 ¶¶ 41, 43-44. But filing on behalf of the deceased, the bankrupt, minors, and persons represented by other firms is difficult to reconcile with counsel's duty to "inform themselves about the facts of their clients' cases." ABA Model R. Pro. Conduct 3.1 cmt. 2; *see also id.* at R. 1.3 & cmt. 2 (requiring each client's matter to receive "reasonable diligence" and a lawyer to handle each matter "competently").

### E. The record raises concerns about counsel's communication with claimants.

Several Defendants told Valve that when they asked to drop their claims, they were told it would cost them. One wrote that Bucher "says if I

drop my arbitration claim now then I'll need to hire another lawyer at my own expense to negotiate with you to remove me from the federal action, or I can pay him a bunch of money to do it." D.Ct. Dkt. 40 ¶ 16. Another reported being told that ending his involvement "would incur fees that I am not currently equipped to deal with." *Id.* ¶ 12. Others said they could not reach their lawyer at all. *Id.* ¶¶ 10, 24. Valve, however, expressly told Bucher and the court that Valve would dismiss claimants who withdrew their arbitrations. *See* D.Ct. Dkt. 12 at 5; *see also* D.Ct. Dkt. 39.

This raises serious questions about the adequacy and veracity of information shared with claimants. Counsel must keep each client informed, consult on means to achieve their objectives, and promptly comply with reasonable requests for information. ABA Model R. Pro. Conduct 1.4(a). A client must be allowed to drop a claim if they choose. *See id.* at R. 1.2(a) ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation."). And informed consent generally requires that the lawyer has "communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct," and "usually require[s] an affirmative response by the client." *Id.* at R. 1.0(e) & cmt. 7. A lawyer cannot abide by a client's decisions

about the objectives of representation without first consulting the client. *See id.* at R. 1.2(a) & cmt. 1. Lastly, a lawyer must withdraw from representation when they are discharged. *Id.* at R. 1.16(a)(3). A client's right to discharge counsel and abandon a claim is not supposed to carry the price that Bucher said it did.

There are additional ethical concerns in this case and in the parallel arbitrations. *See id.* at R. 3.3(a). Bucher Law would not accept service for Defendants, even while asserting to Valve's counsel and the district court that it represented them. D.Ct. Dkt. 39 at 3-4; D.Ct. Dkt. 78 ¶ 42 n.16; D.Ct. Dkt. 81 ¶ 41 (citing D.Ct. Dkt. 64). One Defendant in this action testified that he had not retained Bucher Law for any engagement other than his arbitration, indicating that Bucher Law's claim that it represented the Defendant in this lawsuit was false. D.Ct. Dkt. 81 ¶ 42. On June 4, 2025, Bucher Law informed the district court that it represented three individuals who appear to have died before Valve commenced the action on October 18, 2024. *Id.* ¶ 43. Valve discovered and verified that these individuals were deceased, but apparently Bucher Law was unaware of the deaths when it advised the court that it represented those individuals in this action. *Id.*

When an arbitrator directed Bucher Law to certify that 20 claimants intended to proceed in arbitration, counsel submitted boilerplate affidavits for only 14, none of which addressed the question of proceeding. *Id.* ¶ 68.[3] As of August 2025, Bucher Law had failed to produce "no fewer than 20 (out of 52)" claimants to testify in their own final merits hearings. *Id.* ¶ 66. Just days before the final merits hearing in one arbitration, Bucher Law withdrew the claim of a minor on whose behalf Bucher Law could not have had authorization to prosecute an arbitration, after Valve had incurred substantial expense and devoted considerable resources preparing for the hearing. *Id.* ¶ 64.

Bucher Law also withdrew, attempted to withdraw, or requested a "stay" of other claims on the eve of final merits hearings—after Valve expended substantial resources and time briefing pre-hearing motions,

[3] In 2024, Bucher Law successfully moved to dismiss arbitrations on behalf of four claimants on the grounds that the then-current arbitration agreement was unenforceable. D.Ct. Dkt. 81 ¶¶ 10-15. Bucher Law then simultaneously pursued individual arbitrations for its remaining clients while seeking to represent them as putative class members, brazenly conceding in certain instances that it was engaging in "forum shopping." *Id.* ¶¶ 16-19, 30-31. The district court found this conflict disqualifying for purposes of class counsel. Order at 7, *In re Valve Antitrust Litig.*, No. 21-cv-563 (W.D. Wash. May 2, 2025), ECF No. 441.

engaging in information exchange, and participating in numerous pre-hearing conferences. *Id.* ¶ 65. In one set of arbitrations before the same arbitrator, Bucher Law attempted to withdraw the claim of one claimant less than 24 hours before the start of the final merits hearing, and requested stays (without basis or explanation) for three other claimants just 20 minutes before their hearing was set to commence. *Id.* Each of these instances suggests that Bucher Law is prosecuting arbitrations and representing Defendants in this action without their authorization.

Not surprisingly, when claims were tested on the merits, Valve overwhelmingly prevailed. D.Ct. Dkt. 78 ¶ 19 n.9; D.Ct. Dkt. 81 ¶ 46. This is what one would expect from a campaign "geared more toward racking up procedural costs . . . than proving the allegations." *Jones*, 129 F.4th at 1183. And that is why Valve sought relief from this abusive mass arbitration.

## III. Other abuses in mass arbitrations in the public record show that the *Valve* case is not an aberration.

Valve is not alone. Mass arbitrations have produced documented ethical problems and consumer protection issues at every stage of the representation. Because most mass arbitrations are resolved privately, what has surfaced in public filings "may be only the tip of the iceberg." Letter from

Jaime Huff, Vice President & Counsel, Civil Justice Ass'n of Cal., to Enrique Zuniga, Public Trust Liaison, State Bar of Cal., at 2 (July 6, 2023), https://perma.cc/DHW9-EZ5Q (hereinafter "CJAC Letter"); *accord* Letter from Christopher M. Carr, Att'y Gen. of Ga., to Kimberly Taylor, CEO, JAMS, et al., at 3 (Dec. 1, 2025) (hereinafter "Georgia AG Letter"). As in the *Valve* litigation, other defendants, including many retailers, have faced misleading solicitations, inadequate vetting of claims, breakdowns in client communication, and undisclosed litigation funding. In each, the burden of responding to demands and fees generated by questionable practices falls on the targeted business.

### A. Misleading solicitations and intake create "clients" who do not know what they signed up for.

As Valve's case shows, arbitration solicitations commonly run on social media, promise compensation, and say little or nothing about arbitration. *See* ABA Model R. Pro. Conduct 7.1 & cmt. 3. They urge consumers to sign up within a minute or two to get paid for an unspecified claim, often without describing the claim, the criteria for eligibility, or the fact that the claim will proceed as an individual arbitration. Some imply that the consumer is joining a collective action.

For example, a recent complaint alleges that one firm recruited more than 1,900 claimants with advertisements that promised "Up to Thousands of Dollars in Compensation"—without disclosing that recruits would be signing up for individual arbitrations in their own names. Verified Compl. ¶¶ 11, 56-60, *Metropolis Techs., Inc. v. Almada*, C.A. No. 2026-1401 (Del. Ch. Oct. 22, 2026). These tactics can generate widespread confusion.

Indeed, the "client engagement" is often an online form. The intake site in a campaign against Samsung told prospective claimants that starting a claim was free and would take under two minutes. *See* Labaton Sucharow, *Samsung Galaxy User In Illinois?*, https://perma.cc/E6TM-AQHJ (last visited Nov. 3, 2026). In a campaign against Tubi, users were invited to complete a "short qualification questionnaire" estimated to take two to three minutes, which asked for basic identifying information but nothing about the user's actual experience with the service. First Am. Compl. ¶¶ 46-48, *Tubi, Inc. v. Keller Postman LLC*, No. 1:24-cv-1616 (D.D.C. Nov. 25, 2024), ECF No. 22-1 (hereinafter "*Tubi* Am. Compl."). Claim forms typically offer only dropdown responses, after which the claimant is routed to an electronic engagement letter—an automated exchange that may be the only investigation counsel performs before threatening or filing a claim.

Predictably, many claimants do not know what they signed up for. The Civil Justice Association of California reported that some advertisements "make it appear that individuals are merely signing up to participate in an investigation or a class action, rather than an individual arbitration proceeding in which the claimant must engage personally." CJAC Letter, *supra*, at 2. The Georgia Attorney General likewise identified consumers who "thought they were signing up for a class action, not an arbitration," and consumers represented by firms they "never retained." Georgia AG Letter, *supra*, at 2.

Pleadings in other campaigns bear this out. For example, Tubi's investigator interviewed 19 claimants whose demands had been withdrawn. According to Tubi, most denied ever being represented by the firm that filed nearly 24,000 individual demands of which they were allegedly a part: three denied agreeing to file any claim; four did not know the basis of their claims; and eight thought the claims concerned a data breach, not the advertising theory actually pleaded. *Tubi* Am. Compl. ¶¶ 78(a)-(c).[4] A claimant who

[4] *See also* Pl.'s Notice of (1) New Evidence Regarding Pending Motions and (2) Intent to Amend the Compl. at 3-4, *Marriott Int'l, Inc. v. Sperling Kenny Nachwalter, LLC*, No. 1:26-cv-900 (D. Md. June 4, 2026), ECF No. 48 (claimants

does not know whether, or by whom, he is represented has not made an informed decision to retain counsel.

### B. The mass arbitration model all but precludes counsel from ethically vetting their clients' purported claims.

This client confusion is not surprising because the mass arbitration model is built to avoid vetting each client's claims. *See* ABA Model R. Pro. Conduct 1.3, 3.1. "Blind reliance on the client is seldom a sufficient inquiry." *S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986), *overruled in part on other grounds by Thomas v. Cap. Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988) (en banc). Blind reliance on an anonymous online form is less sufficient still.

Yet the public record is replete with mass arbitrations involving demands filed on behalf of individuals who do not and cannot have a legitimate claim. Businesses report demands brought for fictitious claimants; claimants who are deceased or incarcerated; non-customers; duplicates; individuals who never authorized the filing; and individuals already

similarly testifying that they did not know their counsel had filed lawsuits on their behalf).

represented by other lawyers in pursuing similar claims against the same company. CJAC Letter, *supra*, at 2.

For instance, in a campaign against a national bank, a process arbitrator required claimants' counsel to supply basic information on claimants. Fewer than 450 of nearly 4,000 claimants did so. Roughly 90% of the claims were dismissed—after the bank had paid more than half a million dollars in non-refundable fees. *See* RLC *Wallrich* Br. at 19-20 (citing Rule 28(j) Letter, *Mosley v. Wells Fargo & Co.*, No. 23-55478 (9th Cir. Nov. 15, 2023), ECF No. 25). This is commonplace in mass arbitration. *See L'Occitane, Inc. v. Zimmerman Reed LLP*, 2024 WL 2227182, at *1, *3-4 (C.D. Cal. Apr. 12, 2024) (denying a motion to compel arbitration for 3,144 claimants after claimants' counsel offered no admissible evidence that claimants had even visited the business's website, let alone transacted on it). One of the most egregious publicly disclosed examples was against Sega, where only 287 of the 19,517 petitioners could be confirmed as actual players of its games. Compl. ¶¶ 51-52 & n.23, *Sega of Am., Inc. v. Consovoy McCarthy PLLC*, No. 1:25-cv-257 (E.D. Va. Feb. 10, 2025), ECF No. 1 (hereinafter "*Sega* Compl.").[5]

[5] *See also* Mem. ISO Mot. to Disqualify at 8, *Marriott Int'l, Inc. v. Sperling Kenny*

Even when the respondent, at its own time and expense, identifies the deceased, the duplicative, and the non-customers, claimants' counsel "typically just voluntarily cross the bogus claimants off their list of clients." CJAC Letter, *supra*, at 3. This "essentially outsourc[es] to defendants the vetting that the mass arbitration filers were ethically obligated to conduct before bringing the claims." *Id.* That burden-shifting turns the duty to investigate on its head. As a result, businesses targeted by mass arbitration face significant monetary loss and business interruption to even determine if the claims are legitimate—followed by immense settlement pressure—for demands filed on behalf of many claimants who have no contestable dispute.

### C. Claimants' counsel in a mass arbitration likely cannot meet their ethical duties of communication and informed consent.

Even when claimants are real and their claims colorable, counsel must still communicate with each client and abide by each client's decisions. ABA Model R. Pro. Conduct 1.0(e) & cmt. 7; *id.* at R. 1.2(a) & cmt. 1; *id.* at R. 1.4(a).

---

*Nachwalter, LLC*, No. 1:26-cv-900 (D. Md. June 4, 2026), ECF No. 37-1 (alleging nearly 7,000 copy-paste demands filed against it included unusable contact information, apparently fictitious names, and vexatious litigants barred by the AAA); Compl. ¶ 55, *SCPS, LLC v. Kind Law*, No. 1:24-cv-2768 (D.D.C. Sept. 27, 2024), ECF No. 1 (186 of 966 claimants not registered users); Compl. ¶ 5, *Epson Am., Inc. v. Adams*, No. 30-2023-01313431 (Cal. Super. Ct. Orange Cnty. Mar. 13, 2023) (arbitrations initiated for 13,000 non-customers).

This cannot occur in a mass arbitration when one firm represents tens of thousands of clients on a compressed, fee-driven timetable.

The record in mass arbitrations shows the consequences. In *Wallrich*, Samsung told counsel on September 27, 2022, that it would not pay the initial fees for some 50,000 claimants. The next day, counsel responded for all 50,000 that they declined to advance Samsung's share. *See* Pet. to Compel Arb., Exs. N-O, *Wallrich v. Samsung Elecs. Am., Inc.*, No. 1:22-cv-5506 (N.D. Ill. Oct. 7, 2022), ECF Nos. 1-15, 1-16. Counsel could not have consulted 50,000 clients in 24 hours. *See* RLC *Wallrich* Br. at 28.

Elsewhere, consumers have described confusion about proceedings filed in their names without their knowledge and have asked to be removed—sometimes by reaching out to the company, which may not be allowed to respond. Some customers who tried to withdraw could not find even basic contact information for their lawyers. *See Sega* Compl. ¶ 38 (reporting that consumers filed Better Business Bureau complaints saying co-counsel's listed phone number did not work and that they could never reach counsel, even to end the representation). None of this is consistent with the attorney-client relationship.

### D. Litigation funding creates pressure that may interfere with claimants' counsel's ethical obligations to mass arbitration clients.

As Valve's case shows, litigation funding adds yet another ethical dilemma, because it introduces a party whose financial interests may diverge from those of each client. *See* ABA Model R. Pro. Conduct 1.7 cmt. 13; *id.* at R. 1.8(f) & cmts. 14-15; *id.* at R. 5.4(c).

Funders often describe themselves as passive. Behrens, *supra*, at 7. But as Chief Judge Connolly of the District of Delaware put it, "[i]f you control the purse strings, you exercise control." *Id.* (citation omitted). Funding agreements may require plaintiffs "to consult with their funder before accepting a settlement offer." *Id.* at 7 n.24 (quoting U.S. Gov't Accountability Off., GAO-25-107214, at 25-26 (2024)). Funders "may also threaten to withdraw financing unless the litigation proceeds according to [their] own strategic preferences." *Id.* at 8 n.28 (citation omitted).

A funding dispute between Sysco Corporation and Burford Capital in a litigation context brought these dynamics into public view. The funding agreement "gave Burford the authority to approve or disapprove of settlements," and Burford withheld approval of settlements Sysco had negotiated because it thought the amounts too low. *Id.* at 8-9 (quoting *In re*

*Pork Antitrust Litig.*, 2024 WL 511890, at *1, *3 (D. Minn. Feb. 9, 2024)). The court refused to allow a Burford affiliate to substitute for Sysco, warning that doing so "will allow a financer with no interest in the litigation beyond maximizing profit on its investment to override decisions made by the party that actually brought suit." *Id.* at 9 (quoting *Pork*, 2024 WL 511890, at *1).

These risks of funding are magnified in mass arbitration. Litigation-funding arrangements are often kept confidential, and it is generally impossible to tell whether a particular mass arbitration was funded at all. *See* Glover, *supra*, at 1339-40 & nn.295-96. Nothing in the typical mass-arbitration filing process requires disclosure to the business, to the arbitrator, or to the claimant that an investor holds an economic interest in the outcome. When a funder's return depends on a quick aggregate payment driven by fees, every client's decision whether to settle, on what terms, and when, is exposed to pressure from a party the client may not know exists. *See id.* at 1340. The ethical rules both forbid that interference and require that the client be told. And in some districts, the court dictates public disclosure as well. *See, e.g.*, D.N.J. L. Civ. R. 7.1.1 (mandating disclosure of third-party funding).

## IV. The ethical problems attendant to mass arbitrations bear directly on Valve's preliminary injunction motion.

The documented ethical abuses in this case and in mass arbitration in general demonstrate why a company like Valve would seek redress in court. The district court here denied Valve's preliminary injunction, concluding in relevant part that the equities disfavored relief because an injunction "would fall hard on the Defendants," while Valve "faces only the burden of the forum it chose." *Abbruzzese*, 2026 WL 1481630, at *11. It rejected Valve's account of the campaign against it on the ground that "the mass arbitration is Valve's own design at work," and it deemed counsel's alleged misconduct "a matter for the arbitrators and the bar, not for this Court sitting in equity." *Id.* It is difficult to understand how documented attorney misconduct in a calculated mass arbitration campaign is not an issue for a court sitting in equity to decide.

The district court's framing overlooks how the ethical problems detailed above shape both sides of the scale. On the claimants' side, the hardship of an injunction depends on claimants having actually chosen, understood, and wished to pursue their arbitrations. Where claimants did not know a demand had been filed in their name, believed they had joined

a class action, wanted out but were told leaving would cost them, or were deceased or minors, halting the mass arbitration does not take from them anything they knowingly sought.

On Valve's side, the burden is not merely "the forum it chose." Valve agreed to arbitrate legitimate, individual disputes with its customers. It did not agree to finance a funder-backed campaign of unvetted claims, eve-of-hearing withdrawals, and duplicative discovery—including more than 60 subpoenas to more than a dozen Valve employees. D.Ct. Dkt. 78 ¶ 202. Bucher Law's reliance on arbitral fee pressure rather than the merits of the dispute was confirmed the day after Valve removed its arbitration agreement, when Bucher Law attempted to file an additional 42,000 arbitration claims with the AAA. *Id.* ¶¶ 80, 113. The AAA refused to administer the arbitrations, noting that claimants could proceed with their claims in court. *Id.* ¶ 80. A business does not consent to this scheme by agreeing to individual arbitration, any more than it consents to potential ethical violations by the lawyers on the other side.

Although these considerations bear most directly on the balance of equities, they are not confined to it. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). They also inform whether Valve's costs are truly the

ordinary, self-chosen expense of arbitration for purposes of irreparable harm, and whether the public interest is served by allowing proceedings marked by such ethical irregularities to continue. *Abbruzzese*, 2026 WL 1481630, at *10-11. And further, they factor into any decision that the contract clause at issue is "monstrously harsh" such that it is substantively unconscionable. *Nelson v. McGoldrick*, 896 P.2d 1258, 1262 (Wash. 1995) (en banc). At a minimum, they should be weighed in any preliminary injunction analysis.

## CONCLUSION

Valve's concerns about these claimants are substantial and arise in many mass arbitrations. These issues need to be addressed. The district court's decision denying Valve's motion for a preliminary injunction should be reversed.

Dated: November 4, 2026

Respectfully submitted,

*<u>/s/ Amy Morrissey Turk</u>*

Amy Morrissey Turk
MCGUIREWOODS LLP
101 West Main Street,
Suite 9000
Norfolk, VA 23510
T: (757) 640-3711
F: (757) 640-3942
aturk@mcguirewoods.com

Grace Greene Simmons
MCGUIREWOODS LLP
1075 Peachtree St. NE
35th Floor
Atlanta, GA 30309
T: (404) 443-5500
F: (404) 443-5599
gsimmons@mcguirewoods.com

Monica Welt
Joshua Moore
RETAIL LITIGATION CENTER, INC.
99 M Street, S.E., Suite 700
Washington, DC 20003
T: (202) 869-0200
monica.welt@rila.org
joshua.moore@rila.org

Paul M. Chappell
MCGUIREWOODS LLP
2601 Olive Street, Suite 2100
Dallas, TX 75201
T: (214) 932-6472
F: (214) 273-7473
pchappell@mcguirewoods.com

*Counsel for Amicus Curiae Retail Litigation Center, Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,820 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in 14-point Book Antiqua font.

*/s/ Amy Morrissey Turk*
Amy Morrissey Turk

## CERTIFICATE OF SERVICE

I hereby certify that on November 4th, 2026, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. All participants in the case are registered ACMS users and will be served by the system.

*/s/ Amy Morrissey Turk*
Amy Morrissey Turk