**No. 26-6092**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

VALVE CORPORATION,
*Petitioner-Appellant,*

v.

USERS OF VALVE'S VIDEO GAME PLATFORM, STEAM,
*Respondents-Appellees.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:24-cv-01717-JNW
Hon. Jamal N. Whitehead, District Judge

# BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER-APPELLANT AND REVERSAL

Jonathan D. Urick
Katherine M. Ferazzi
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Joshua Patashnik*
ASHURST PERKINS COIE US LLP
11452 El Camino Real, Suite 300
San Diego, CA 92130
(858) 720-5767

**Counsel of Record*
*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*

# TABLE OF CONTENTS

**Page**


Interest of Amicus Curiae ........ 1

Introduction and Summary of Argument ........ 2

Argument ........ 7

I. A business may condition continued access to an ongoing licensed service on assent to updated terms. ........ 7

A. Ongoing digital services require the ability to update their governing terms. ........ 8

B. Washington law and broader contract principles treat continued service on updated terms as an ordinary bargain ........ 11

C. The District Court wrongly conflated the loss of future access with the forfeiture of a vested right ........ 13

D. The District Court's rationale has no limiting principle, would harm consumers, and is not necessary to protect against unfair or deceptive business practices. ........ 17

II. Businesses must retain the ability to update service contracts even while litigation is pending. ........ 20

A. Rule 4.2 does not prohibit companies from updating their consumer agreements. ........ 21

B. It is not procedurally unconscionable to update a consumer agreement while litigation is pending. ........ 23

Conclusion ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 495 F.3d 1062 (9th Cir. 2007) ..... 12

*Gray v. Amazon.com, Inc.*, 653 F. Supp. 3d 847 (W.D. Wash. 2023) ..... 11

*Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*, 820 F. Supp. 3d 353 (E.D. Pa. 2026) ..... 22, 23

*Haider v. Lyft, Inc.*, No. 20-cv-2997, 2021 WL 3475621 (S.D.N.Y. Aug. 6, 2021) ..... 21, 22, 23

*Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670 (9th Cir. 2024) ..... 19

*Hill v. Garda CL Nw., Inc.*, 308 P.3d 635 (Wash. 2013) ..... 24

*Jones v. Starz Ent., LLC*, 129 F.4th 1176 (9th Cir. 2025) ..... 3

*M.A. Mortenson Co. v. Timberline Software Corp.*, 998 P.2d 305 (Wash. 2000) ..... 11

*MDY Industries, LLC v. Blizzard Ent., Inc.*, 629 F.3d 928 (9th Cir. 2010) ..... 10

*Peoples v. United Servs. Auto. Ass'n*, 452 P.3d 1218 (Wash. 2019) ..... 18

*ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996) ..... 8, 11

*Retail Clerks Health & Welf. Tr. Funds v. Shopland Supermarket, Inc.*, 640 P.2d 1051 (Wash. 1982) ..... 15

*State v. Brown*, 965 P.2d 1102 (Wash. Ct. App. 1998) ..... 20

*Tadych v. Noble Ridge Constr., Inc.*, 519 P.3d 199 (Wash. 2022) ..... 25

*United Fin. Cas. Co. v. Coleman*, 295 P.3d 763 (Wash. Ct. App. 2012) ..... 12

*Valenzuela v. Battelle Energy All., LLC*, 699 F. Supp. 3d 1012 (D. Idaho 2023) .......... 22

*Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010) .......... 8

*Young v. Young*, 191 P.3d 1258 (Wash. 2008) .......... 18

*Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753 (Wash. 2004) .. 14, 15, 24

**STATUTES**

15 U.S.C.
§ 6501 .......... 10
§ 6506 .......... 10

Cal. Bus. & Prof. Code
§ 17600 .......... 10
§ 17606 .......... 10

Cal. Civ. Code
§ 1798.100 .......... 10
§ 1798.199.100 .......... 10

Wash. Rev. Code
ch. 19.373 .......... 10
§ 19.86.020 .......... 18

**RULES**

Fed. R. App. P. 29(a)(4)(E) .......... 2

Wash. RPC 4.2 .......... 6, 21, 22, 23

**OTHER AUTHORITIES**

1 Williston on Contracts § 4:3 (4th ed. 1990) .......... 12

8 Williston on Contracts § 18:13 (4th ed. 1990) .......... 20

28 Williston on Contracts § 71:7 (4th ed. 1990) .......... 15

Robert W. Gomulkiewicz, *Considering a Right to Repair Software*, 37 Berkeley Tech. L.J. 941 (2022) .......... 9

Robert W. Gomulkiewicz, *Getting Serious About User-Friendly Mass Market Licensing for Software*, 12 Geo. Mason L. Rev. 687 (2004) ..... 8

Restatement (Second) of Contracts § 89 (A.L.I. 1981) ............................ 12

## INTEREST OF AMICUS CURIAE

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business organization. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

Many of the Chamber's members provide software, digital content, and online services to consumers and businesses through continuing license and subscription relationships rather than one-time sales. Those relationships are governed by standard terms that must be updated from time to time as security threats, legal obligations, technology, and commercial conditions change. The District Court held that conditioning a customer's continued use of a licensed service on assent to updated terms is procedurally unconscionable, at least where the customer has a claim pending against the service provider. That holding, if adopted by this

Court, would call into question the ordinary mechanism by which millions of ongoing digital relationships are kept current. The Chamber and its members therefore have a strong interest in this appeal.

A motion for leave to file this brief accompanies this brief.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal concerns the ordinary way businesses keep ongoing digital relationships up to date. Software licensing is an incredibly common business model within the tech industry. Operating systems, productivity suites, mobile apps, digital media, cloud storage, and video-game platforms (among other types of services) are all offered to consumers through continuing licenses rather than outright sales. Software is not a physical product that changes hands once. It is a service that the provider must keep running, securing, and updating—often for many years.

Steam is a familiar example. Users license games through accounts that depend on Valve's servers, payment systems, anti-cheat tools, and content-delivery network. To create an account, every Steam user agrees

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

to the Steam Subscriber Agreement ("SSA"), which allows Valve to amend its terms on at least 30 days' notice. 2-ER-270.

In September 2024, Valve amended its terms for all users in accordance with that provision. It did so while facing both a mass arbitration and an overlapping putative class action in court, at the same time, brought by the same plaintiffs' firm. Opening Brief of Valve Corp. ("Valve Br.") 2–3. That reflected an apparent strategy by the plaintiffs' firm to leverage the substantial fees accompanying a large number of arbitrations to extract a settlement from Valve without regard to the underlying merits of the claims. *See id.* This Court has previously criticized such tactics. *See Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1183 (9th Cir. 2025) ("the mass-arbitration tactic deployed here … appears to be geared more toward racking up procedural costs to the point of forcing [the defendant] to capitulate to a settlement than proving the allegations … on the merits").

Valve amended its terms to replace the version of the SSA then in effect (the "Superseded Agreement") with an updated version (the "Current Agreement"). 1-ER-13–14. Valve notified every user of the change and told users that the new terms would take effect on November 1, 2024,

unless they canceled their accounts or stopped using the affected services. 1-ER-14–17.

The District Court found that Respondents likely assented to the Current Agreement. 1-ER-26–27. It nonetheless held the Current Agreement's forum-selection clause procedurally unconscionable, principally because declining the new terms meant giving up continued access to games Respondents had already licensed, and secondarily because Valve included in its system-wide notice users who were represented by counsel in pending arbitrations. 1-ER-28–32. The court separately held the clause substantively unconscionable. It therefore concluded that Valve was unlikely to succeed in staying the pending arbitrations. 1-ER-32–36; *see* Valve Br. 16–18.

This brief addresses only the District Court's procedural-unconscionability holdings. Valve's opening brief explains why the Current Agreement satisfies each factor Washington courts use to assess meaningful choice, why conditioning a benefit Valve had no duty to provide is not coercive, and why video games are nonessential recreational products. Valve Br. 28–47. The Chamber does not repeat those points. It

writes to make two additional points concerning the broader context of businesses that offer ongoing digital services.

I. The District Court's procedural-unconscionability holding proceeds from a mistaken premise about how ongoing licensing relationships work. A software license is not a vested property right; it is a continuing contractual relationship that, like any subscription, either party may end. The licensing model is widespread because it benefits businesses and consumers alike, and it depends on the provider's ability to maintain a single, current set of terms as security threats, regulatory mandates, and technology change. Washington law has long recognized and accepted this business model. The customer's protection from unwanted terms is notice and the freedom to discontinue the contractual relationship, not a right to keep receiving the service on frozen terms.

By treating the routine updating of consumer terms of use as procedurally unconscionable, the District Court's ruling effectively prohibits businesses from ever changing the terms applicable to existing users of their services. That drastic approach is not necessary to protect consumers. A customer who believes a change in terms has deprived her of value she bargained for may have familiar contractual and quasi-

contractual remedies, and state consumer-protection statutes may apply. But that concern does not justify stretching unconscionability doctrine beyond its limits and, in the process, threatening a ubiquitous business model that companies and consumers value alike.

II. The fact that some Steam users were represented in pending arbitrations neither implicates the rules of professional conduct nor bears on unconscionability. Rule 4.2 of the Rules of Professional Conduct regulates *lawyers* who communicate with represented persons, and the rule's own commentary confirms that parties may communicate directly with one another. Updates to terms of service that are sent out to all of a company's users do not implicate the concerns about litigation gamesmanship underlying Rule 4.2, and it would be impractical for a company to exclude parties in pending litigation from updates to terms that apply to all users. Nor does a consumer's representation by counsel increase potential unfairness; such persons have more protection than the average consumer, not less.

## ARGUMENT

### I. A business may condition continued access to an ongoing licensed service on assent to updated terms.

The District Court's analysis rests on a mistaken premise about what a software license is. A license is not a vested property right. It is a continuing relationship in which the provider grants permission to use its software and services on stated terms, and both sides agree that the relationship may change or end. That model benefits both sides. Businesses can offer access at lower up-front prices, deliver continuous security and feature updates, and quickly adapt to new legal requirements. Consumers get immediate access to constantly improving services without bearing the full cost of ownership.

The District Court's procedural-unconscionability analysis turned on what it called a "forced election": a user could decline the new subscriber terms or continue using Steam, "but not both." 1-ER-30. That framing calls into question every continuing-service relationship. The practical effect of the District Court's analysis would be to prohibit a business from offering uniform terms to all of its customers, and instead require a business to continue serving some customers on terms the business is no longer willing to offer. No relevant body of law prohibits

the ordinary-course updates to terms of use that are an essential feature of ongoing service relationships. The customer's protection lies in notice and the freedom to decline the updated terms, not in a unilateral right to perpetual service on terms to which the business does not agree.

### A. Ongoing digital services require the ability to update their governing terms.

As Valve explains, the content available on Steam is licensed, not sold: every version of the SSA relevant here states that the content and services are "licensed, not sold" and that the license "confers no title or ownership." 2-ER-265, 2-ER-276; *see* Valve Br. 9, 37. That licensing arrangement is typical. This Court has long recognized that software is commonly distributed through licenses that retain the provider's title and delineate the user's rights. *See Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1110–11 (9th Cir. 2010); Valve Br. 35–37 (collecting cases).

The license model is widespread because it offers significant practical benefits to both providers and consumers. Licensing lets a software provider tailor rights and prices to different uses, so that consumers who need only personal-use rights can obtain access at a lower price than commercial users who need more. *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449–50 (7th Cir. 1996); *see also* Robert W. Gomulkiewicz, *Getting*

*Serious About User-Friendly Mass Market Licensing for Software*, 12 Geo. Mason L. Rev. 687, 690 (2004) ("For example, a software publisher might license word processing software to business users for one price, to home users for a lower price, academic institutions for an even lower price, and to charitable organizations for free."). This model also allows providers to "regularly supply bug fixes, security patches, and a variety of other updates to their users, often at no charge." Robert W. Gomulkiewicz, *Considering a Right to Repair Software*, 37 Berkeley Tech. L.J. 941, 946 (2022). And the license model allows customers to install and play video games and other media on multiple different devices, in multiple locations.

The license model is particularly important in the context of a platform like Steam, which provides consumers an ever-changing service, not merely a one-time purchase of goods. Consider what it takes to keep such a platform running. Valve must keep its software compatible with new operating systems and hardware. It must also update authentication and other account-security systems against evolving cybersecurity attacks. And specific to online multiplayer video-gaming services that Valve provides, it must update and maintain digital infrastructure; moderate

content and player behavior; and maintain anti-cheat tools whose effectiveness depends on terms that prohibit new forms of misconduct as they emerge. Updates to such terms are central to the operation of video games. *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 938–41, 956 (9th Cir. 2010) (when game provider responded to a third-party "bot" program by revising its terms of use to prohibit it, this Court analyzed those revised terms as the operative licensing conditions).

Businesses' legal obligations change, too, and often require changes to user terms on a fixed timetable. In recent years, businesses offering online services have had to implement new requirements governing children's data, *see* 15 U.S.C. §§ 6501–6506; comprehensive state consumer-privacy regimes, *see, e.g.*, Cal. Civ. Code §§ 1798.100–1798.199.100; heightened protections for health information, Wash. Rev. Code ch. 19.373; and regulations on automatic subscriptions, *see, e.g.*, Cal. Bus. & Prof. Code §§ 17600–17606. If providers do not revise what their terms say about data use, content, cancellation, or dispute resolution across all users, they risk violating applicable state laws and regulations.

Both businesses and consumers are best served by clear, uniform terms of use applicable to all users. Businesses benefit from predictability

and lower administrative costs, both in tracking which terms apply to which customers and in ensuring compliance with applicable regulations. Consumers gain certainty about the rules that govern their use of the services and their rights under the agreements. The District Court's rule would lead to version fragmentation that would make it difficult to enforce uniform conduct standards and would produce inequality among customers. The ability to condition continued usage on agreement to uniform terms is not an aggressive litigation tactic. It is the basic premise of any ongoing digital service.

### B. Washington law and broader contract principles treat continued service on updated terms as an ordinary bargain.

Washington has never required that every term of a software license be fixed at the moment of first payment. In *M.A. Mortenson Co. v. Timberline Software Corp.*, 998 P.2d 305, 312–13 (Wash. 2000), the Washington Supreme Court enforced licensing terms that accompanied software delivered after the purchase order, endorsing the "layered" model of contract formation recognized in *ProCD, Inc.*, 86 F.3d 1447. The court recognized that software relationships are governed by terms that may arrive, and be accepted, over time and through use. Federal courts

applying Washington law have accordingly enforced modified online terms accepted through continued use of a service. *See, e.g.*, *Gray v. Amazon.com, Inc.*, 653 F. Supp. 3d 847, 857 n.9 (W.D. Wash. 2023), *aff'd*, No. 23-35377, 2024 WL 2206454 (9th Cir. May 16, 2024).

General contract-modification principles point the same way. A contract that contemplates continuing performance may be modified when the parties' circumstances change, and an offer to continue an ongoing relationship on revised terms is accepted when the other party, with notice, elects to continue. *See* Restatement (Second) of Contracts § 89 (A.L.I. 1981); *Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007) (noting that "a revised contract is merely an offer and does not bind the parties until it is accepted") (citing 1 Williston on Contracts § 4:13 (4th ed. 1990). Washington law likewise recognizes that parties to an existing contract may become bound by modified terms "if the offeree's actions clearly evince acceptance of the offeror's modifications." *United Fin. Cas. Co. v. Coleman*, 295 P.3d 763, 768 (Wash. Ct. App. 2012). Each period of continued service is itself a fresh exchange: the provider continues to supply servers, security, updates, and new features, and the customer continues to use them.

### C. The District Court wrongly conflated the loss of future access with the forfeiture of a vested right.

The District Court's analysis rested on the mistaken premise that declining the Current Agreement required a user to "abandon … the game license(s) she had already bought." 1-ER-29. Valve explains why "bought" was a misnomer: users had no vested property right to begin with under the SSA's terms. Valve Br. 39.

That is true generally with respect to ongoing digital services. A user who declines to continue using such online services (because she does not want to accept the new terms or for any other reason) has not lost anything she had already received. She had already enjoyed the use of the services—here, video games and support for online multiplayer play—for as long as she had used them. What she gave up by declining was the *future* stream of services that Valve was offering to provide on new terms.[2] That is the same choice any customer faces when she declines to renew a subscription, an insurance policy, or a software-as-a-service contract on revised terms.

[2] And even that loss was not inevitable: a user who preferred to keep arbitrating could simply stop using Steam while her arbitration proceeded, as some claimants did. Valve Br. 38, 43.

This is a commonplace commercial reality. A party to an ongoing commercial relationship may generally decline to continue it. A subscriber may cancel a streaming service, and a streaming service may stop carrying a title or stop serving a market. Businesses close, leave jurisdictions, discontinue product lines, and retire legacy platforms. When they do, customers lose future access to services they may have valued. No one would suggest that a software company that went out of business thereby acted unconscionably toward customers who had relied on its platform.

Washington's procedural-unconscionability doctrine asks whether a party lacked "meaningful choice" in light of the "manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in a maze of fine print." *Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 759 (Wash. 2004) (en banc) (citation modified). Those factors focus on the fairness of the bargaining *process*—whether the party knew what was being proposed and had time and opportunity to consider it. Procedural unconscionability does *not* ask whether a party would incur some cost by rejecting an agreement. Every decision to decline a renewal offer has a cost; the more valuable the service to the customer, the

higher that cost is. Indeed, the Washington Supreme Court in *Zuver* found no procedural unconscionability in an employment agreement that conditioned the employee's job on accepting arbitration—a far more significant consequence than the loss of future access to a recreational service. *Id.* at 760–61; *see* Valve Br. 33–35 (collecting similar cases).

The potential loss of access to games or other valuable licensed content would not generally render amendments to terms of service substantively unconscionable either. This is effectively an "economic duress" argument—*i.e.*, that a party should be relieved of its obligations under a contract because it would have been too costly to refuse to assent to the contract. Courts in Washington and elsewhere have explained that this doctrine is "reserved for extreme and extraordinary cases," 28 Williston on Contracts § 71:7 (4th ed. 1990), and requires at a minimum "wrongful or oppressive conduct" on the part of the defendant, *Retail Clerks Health & Welf. Tr. Funds v. Shopland Supermarket, Inc.*, 640 P.2d 1051, 1054 (Wash. 1982) (the "mere fact that a contract is entered into under stress or pecuniary necessity is insufficient" to establish a contract defense).

Under the District Court's reasoning, the more a customer values a service—and the more money she has spent on it in the past—the more

problematic it is to condition her continued use on assent to the latest terms of use. That rule would punish businesses for building services that customers find valuable. It would also make the enforceability of an update turn on facts unique to each user, such as the size of her game library, rather than on anything about how the terms were presented. *See* 1-ER-29–30 (relying on Respondents' counsel's assertion that Respondents' libraries reflect on average more than $3,000 of spending).

Last, Steam users—like many consumers—agreed at the outset of their relationship that their license would "end[] upon termination of" the agreement (including when the agreement is superseded by a new version of the SSA), and that the "only remedy" for not accepting an amendment to the agreement was to cancel the account or cease using the services. 2-ER-265, 2-ER-270. Such agreements are commonplace and enforceable, for the reasons explained above. No one contends that this term was unconscionable before the parties' dispute arose. If the exit term was fairly bargained when the relationship began, it did not become unfair simply because a user later objected to the substance of a particular amendment.

### D. The District Court's rationale has no limiting principle, would harm consumers, and is not necessary to protect against unfair or deceptive business practices.

The logic of the decision below is not confined to video games or to dispute-resolution clauses. Nearly every participant in the digital economy has something invested in the platforms she uses: a library of films or music, a network of friends or audience of followers on social media, years of photos in cloud storage, a curated playlist, saved documents, accumulated loyalty points, or professional data in a business software suite. If the prospect of losing future access to such a service rendered an update procedurally unconscionable, then virtually every update to terms of service would be vulnerable to challenge by any user who would prefer a prior version of the terms. That would include updates to privacy policies required by new law, to content rules adopted to protect minors, and to security provisions adopted to combat fraud. Such a rule would be a dramatic change in the law, with many unforeseeable and potentially far-reaching consequences.

Businesses confronted with such a rule would have to respond, and each available response would leave consumers worse off. Providers could stop offering durable software licenses and move to requiring outright

purchases for each new software version. They could prohibit access by users with pending claims, a result that would be far harsher than giving those users the same choice offered to everyone else. Or they could stop updating terms at all, leaving outdated security, conduct, and privacy provisions in place. None of those outcomes benefits consumers.

Declining to expand procedural-unconscionability doctrine does not leave customers without recourse. A customer who believes a change in terms has deprived her of value she bargained for may have familiar contractual and quasi-contractual remedies. If a provider ends a customer's access in breach of the governing terms—for example, by terminating an account without the notice the terms require—the customer may sue for breach of contract. If a provider keeps payment for a benefit it no longer provides in circumstances that make that approach unjust, principles of restitution and unjust enrichment may come into play. *See Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). And state consumer-protection statutes, including Washington's Consumer Protection Act, reach unfair or deceptive practices. Wash. Rev. Code § 19.86.020; *see Peoples v. United Servs. Auto. Ass'n*, 452 P.3d 1218, 1221 (Wash. 2019).

The Chamber takes no position on precisely whether or how any of these potential remedies would apply in this case or in any other specific factual circumstance. The key point is that all of these potential remedies are calibrated to the harm a particular customer actually suffers under a particular contract, and they can be applied case by case without casting doubt on the general validity of the ordinary practice of updating terms. Because these remedies exist, there is no need to stretch procedural unconscionability, a doctrine concerned with the fairness of the bargaining process, to cover a customer's dissatisfaction with the consequences of a clearly disclosed choice.

Nor does the Chamber address here the question of whether, on the specific facts of this case, it was *substantively* unconscionable for Valve to amend its terms to designate a judicial forum for disputes already pending in arbitration. As this Court has previously recognized, the substantive-unconscionability analysis is highly case-specific, depending on whether particular contract terms are "overly harsh or one-sided" in the context of the dispute at hand. *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 683 (9th Cir. 2024) (citation modified); *see id.* at 683–88. The application of substantive-unconscionability doctrine to the specific facts

here is outside the scope of this *amicus curiae* brief. As Valve explains, however, numerous courts have rejected the view that it is always substantively unconscionable to apply new terms to disputes already pending in a particular forum. Valve Br. 48–51. Accordingly, this Court should not adopt any categorical rule prohibiting parties from agreeing to new terms that apply to disputes already pending.[3]

## II. Businesses must retain the ability to update service contracts even while litigation is pending.

Separately, there is no merit to the District Court's suggestion that Valve acted unethically in updating its subscriber agreement for all users while litigation was pending. 1-ER-31–32. Adopting Respondents' proposed rule would hamstring businesses by allowing the mere filing of a lawsuit to freeze consumer contracts into place. Neither the rules of professional conduct nor Washington law prohibits businesses from making updates to their contract terms that apply broadly to all customers.

---

[3] Moreover, the District Court was wrong to hold against Valve the fact that arbitrations had progressed during the 19-month period in which its lawsuit seeking relief was pending. *See* Valve Br. 67–68. "The determination of whether a given clause or contract is in fact unconscionable is to be made at the time of its making," not at the time a court later confronts the question. 8 Williston on Contracts § 18:13 (4th ed. 1990); *see State v. Brown*, 965 P.2d 1102, 1111 (Wash. Ct. App. 1998) ("[W]e evaluate unconscionability as of the time of the agreement.").

### A. Rule 4.2 does not prohibit companies from updating their consumer agreements.

Both Respondents and the District Court invoke Rule 4.2 of the Washington Rules of Professional Conduct in attacking Valve's ordinary-course updating of the SSA. The rule provides that in "representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Wash. RPC 4.2. But Valve—the party that both revised the SSA and communicated that revision to all current subscribers (including some Respondents here)—is not a lawyer. And even assuming *arguendo* that attorneys had a role in revising the SSA, Respondents have not shown that those attorneys were representing Valve in connection with *their arbitrations*, let alone that they directed Valve to contact Respondents. As then–District Judge Nathan explained in rejecting an identical challenge under New York's equivalent Rule 4.2, a company's "counsel d[oes] not communicate with the [plaintiffs] about the subject of the litigation by drafting revisions to [the company's] arbitration agreement." *Haider v. Lyft, Inc.*, No. 20-cv-2997, 2021 WL 3475621, at *3 (S.D.N.Y. Aug. 6, 2021).

Other courts to consider the issue have reached the same conclusion: "Viewed under the lens of Rule 4.2, a proposed update to" a consumer agreement "does not qualify as a communication between [the company's] counsel and the named plaintiffs." *Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*, 820 F. Supp. 3d 353, 371 (E.D. Pa. 2026) (observing that "it is hard to think of a good reason" to invalidate or enjoin enforcement of an arbitration agreement under Rule 4.2); *Valenzuela v. Battelle Energy All., LLC*, 699 F. Supp. 3d 1012, 1018 (D. Idaho 2023) ("non-targeted communication from human resources" to all employees did not violate Rule 4.2).

Holding otherwise would necessarily constrain companies' ability to respond to changes in the business or regulatory environment by altering their consumer agreements accordingly. This would be "unworkable in practice" because large corporations "may face a number of lawsuits at any given time, and prohibiting routine amendments to their terms of service would essentially freeze their contracts in place." *Haider*, 2021 WL 3475621, at *3.

Moreover, updates sent by a company automatically to all users do not implicate the central concern underlying Rule 4.2: They are not

"specifically targeted at the pending litigation," nor do they improperly seek to circumvent any user's counsel. *Id.* at *2. These updates are not communications from a lawyer to a represented party concerning litigation. They are, at most, "communication[s] between represented parties," which are not subject to Rule 4.2. *Greystone Mortg.*, 820 F. Supp. 3d at 371; *accord Haider*, 2021 WL 3475621, at *3.

### B. It is not procedurally unconscionable to update a consumer agreement while litigation is pending.

Nor should the Court conclude that consumers are incapable of forming contracts with businesses during the pendency of litigation. If a plaintiff (or absent class member) wishes to continue using a company's services while her consumer claims are adjudicated, she should have the right to do so. But that is impossible under Respondents' proposed rule, because a business cannot and should not be compelled to provide services to a customer who will not agree to the terms under which those services are provided. Thus, if consumers are held to lack capacity to enter into customer agreements like the SSA while their lawsuits are pending, companies may have no choice but to bar such consumers from their services or platforms. Such a result would be anti-consumer, anti-business, and anti-freedom of contract.

Because unconscionability requires setting aside an otherwise-enforceable agreement, Washington courts set a high bar for unconscionable conduct. It is not enough to say that a term is unfair—for it to be substantively unconscionable, it must be "overly or monstrously harsh, … one-sided, shocks the conscience, or is exceedingly calloused." *Hill v. Garda CL Nw., Inc.*, 308 P.3d 635, 638 (Wash. 2013). Similarly, procedural unconscionability requires more than just a showing "that unequal bargaining power exists"—the "key inquiry" is whether the counterparty "lacked meaningful choice." *Zuver,* 103 P.3d at 761.

It is neither monstrous nor coercive for a company to offer all of its customers—including those with pending lawsuits against the company—the same contractual terms. Rather, both litigants and non-litigants face exactly the same choice: agree to the updated agreement and continue to use the company's services, or decline the agreement and terminate their use of the company's services. Respondents would have companies like Valve offer user-plaintiffs *more favorable* contractual terms than are available to other customers. This Court should not impose such an extraordinary duty.

Rejecting consumer agreements entered into while litigation is pending as *per se* procedurally unconscionable would needlessly tie the hands of companies by preventing them from making relevant, necessary changes to their consumer agreements. And the mere fact of litigation does not transform the relationship so as to coerce the consumer's choice or render it illusory. To the contrary, an individual represented by counsel at the time he or she agrees to a litigation adversary's new terms of service has more protection than the average consumer—not less. *See Tadych v. Noble Ridge Constr., Inc.*, 519 P.3d 199, 204 (Wash. 2022) (weighing the "expertise or sophistication of the parties" in determining procedural unconscionability). This Court should recognize that consumer agreements entered into while litigation is pending are not categorically unenforceable.

## CONCLUSION

The District Court's order denying a preliminary injunction should be vacated or reversed.

Dated: November 4, 2026

Respectfully submitted,

/s/ Joshua Patashnik

Joshua Patashnik
ASHURST PERKINS COIE US LLP
11452 El Camino Real, Suite 300
San Diego, CA 92130
(858) 720-5767

*Counsel for* Amicus Curiae

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-6092

I am the attorney or self-represented party.

**This brief contains 4,973 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Joshua Patashnik* **Date** November 4, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. All participants in the case are registered ACMS users, and service will be accomplished by the appellate ACMS system.

Ashurst Perkins Coie US LLP

Dated: November 4, 2026

*/s/ Joshua Patashnik*
Joshua Patashnik
*Counsel for* Amicus Curiae